IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HEATHER LINK, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-812 |
| | ) | Judge Joy Flowers Conti/ |
| | ) | Magistrate Judge Maureen P. Kelly |
| CAROLYN W. COLVIN, ACTING | ) | |
| COMMISSIONER OF SOCIAL | ) | Re: ECF Nos. 8, 12 |
| SECURITY, | ) | |
|     Defendant. | ) | |

**REPORT AND RECOMMENDATION**

I. **RECOMMENDATION**

It is respectfully recommended that the Court grant in part and deny in part Plaintiff's Motion for Summary Judgment (ECF No. 8), deny Defendant's Motion for Summary Judgment (ECF No. 13), and vacate and remand the decision of the administrative law judge ("ALJ") for reconsideration.

II. **REPORT**

    A. **Procedural History**

Plaintiff, Heather Link ("Link"), brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Commissioner of Social Security ("Defendant" or "Commissioner") disallowing her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI, respectively, of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, 1381-1383f.

1

Link protectively filed an application for DIB benefits on September 15, 2010, and SSI benefits on May 25, 2011, claiming an onset of disability of September 30, 2008,[1] due to juvenile rheumatoid arthritis, acid reflux, gastritis, headaches and depression. (R. at 14, 200-201). The state agency denied her initial claim for DIB on November 1, 2010. (R. at 142-146). On January 3, 2011, Link requested a hearing before an administrative law judge ("ALJ"). (R. at 149-150). On December 12, 2011, a hearing was held in Morgantown, West Virginia, before ALJ George A. Mills III. Link was represented by counsel. Larry Bell ("Bell"), a vocational expert, testified at the hearing. (R. at 31-75). Following the hearing, the ALJ issued a decision on January 17, 2012, (R. at 14-24), finding:

1) The claimant meets the insured status requirements of the Act through December 31, 2013.

2) The claimant has not been engaged in substantial gainful activity since April 3, 2010 (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3) The claimant has the following severe impairments: juvenile rheumatoid arthritis; cervical and lumbar subluxation; mood disorder; and depression (20 CFR 404.1520(c) and 416.920(c)).

4) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5) The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the type of work must: entail no climbing of ladders, ropes, or scaffolds and no more than occasional climbing of ramps or stairs, balancing, stopping, kneeling, crouching, or crawling; entail no more than occasional handling, bilaterally; entail no concentrated exposure to wetness or hazards (i.e. unprotected heights or dangerous machinery); be limited

---

[1] Link previously filed concurrent applications for DIB and SSI on September 29, 2008. These were initially denied on January 22, 2009. (R. at 129-132). Link filed new applications for DIB and SSI on August 31, 2009 and December 4, 2009, respectively (R. at 189-192) which were denied on April 2, 2010. (ECF No. 13, n. 1). Because Link did not appeal these denials, the ALJ considered only the period from April 3, 2010, through January 17, 2012, (the decision date) in determining Link's eligibility for benefits.

>to unskilled work activities; entail no more than occasional contact with the public, supervisors, or coworkers; and entail no rapid production quotas.
>
> 6) The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).
>
> 7) The claimant was born on May 28, 1979, and was 29 years old on the date of her application, and is a "younger individual" (age 18-49) (20 CFR 404.1563 and 416.963).
>
> 8) The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).
>
> 9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not-disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
>
> 10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).
>
> 11) The claimant has not been under a disability, as defined in the Social Security Act, from April 3, 2010, through the date of [the] decision (20 CFR 404.1520(g) and 416.920(g)).

(R. at 16-24).

The Appeals Council denied Link's request for review on April 9, 2013, making the ALJ's decision the final decision of the Commissioner. (R. at 1-3). Link commenced this action on July 1, 2013, seeking judicial review of the Commissioner's decision. (ECF No. 3). Link and the Commissioner filed motions for summary judgment on November 5, 2013, and January 31, 2014, respectively. (ECF Nos. 8 and 12). The matter has been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B)-(C). The motions for summary judgment filed by the parties are the subject of this Report and Recommendation.

B.   **Factual Background**

   **1. Medical History**

The relevant medical records show that Link was diagnosed with juvenile rheumatoid arthritis ("JRA") when she was approximately ten years of age. (R. at 523). In January 2004, Link sought treatment with a rheumatologist, David E. Seaman, M.D., of Arthritis and Rheumatology Associates of Southwestern Pennsylvania, complaining of worsening arthritis symptoms throughout her body, and TMJ[2] pain. Dr. Seaman's physical examination of Link revealed tenderness in her TMJ joints, swelling of her PIP[3] joints, and an accumulation of fluid on her knees. He also found Link to have mild synovitis[4] of the left ankle, and trace synovitis of the right ankle. Most remarkably, Dr. Seaman noted a 30-degree lack of extension in Link's right elbow, which Link reported she had been unable to fully straighten since high school. Dr. Seaman confirmed the original diagnosis of juvenile rheumatoid arthritis, with continued inflammatory disease activity, and suspected polyarticular disease. (R. at 523-524).

Link was not seen by Dr. Seaman between May 2004 and January 2010. (R. at 518). However, she received intermittent care for her chronic JRA symptoms from her primary care physicians at Cherry Tree Medical Associates ("Cherry Tree") in 2007 and 2008, and sought treatment at regularly scheduled intervals beginning in May 2009. Treatment notes from those visits reveal a pattern of escalating pain, and increasingly aggressive modes of treatment pursued by her doctors, including the use of narcotic pain relievers and corticosteroid therapies. (R. at 457-504, 548-597).

---

[2] Temperomandibular Joint Disorder ("TMJ") is a dysfunction of the joints and muscles of the jaw.

[3] Proximal interphalangeal joint ("PIP") is the second joint from the tips of the fingers.

[4] Synovitis is inflammation of the synovial membrane, which lines the joints.

On May 30, 2009, Link presented to Cherry Tree, complaining of severe pain in her left leg, which she described as feeling "like a constant charlie horse." (R. at 559). Physical examination revealed calf tenderness and swelling in her left calf. Id. Link was prescribed the pain medications, Ultram (tramadol) and Aleve (naproxen sodium). (R. at 564). A venous Doppler test of the left leg, administered on June 1, 2009, revealed the presence of a Baker's cyst, a swelling of the bursa surrounding the knee joint that is commonly linked to arthritis.

On June 4, 2009, Link returned for follow-up care at Cherry Tree, where she was seen by her primary care physician, Dr. Santhosh Sadashiv. Link indicated that the pain in her left leg had subsided, but complained of joint pain, joint swelling, and stiffness. A physical examination revealed mild RA changes in Link's hands. Dr. Sadashiv assessed that Link's JRA had deteriorated, and suggested that she return to her rheumatologist for further treatment options. Dr. Sadashiv also continued Link on the pain relievers, Ultram and Aleve. (R. at 566-567).

Link again visited Cherry Tree on August 6, 2009. Physical examination revealed decreased range of motion in Link's finger joints. Dr. Sadashiv prescribed the narcotic pain reliever, Vicodin, twice daily. (R. at 568-569). Subsequently, Link returned to Cherry Tree for management of her chronic arthritis condition every four to six weeks, and continued to take Vicodin as prescribed.

On January 14, 2010, Link was evaluated by Dr. David Seaman, the rheumatologist who had previously examined her in 2004. She reported to Dr. Seaman that she had managed her symptoms with Aleve until a month after the birth of her daughter in May 2009, when she began experiencing increased pain and swelling in her hands and knees. She also complained of worsening pain in her wrists, elbows, shoulders, ankles and feet. (R. at 508). Dr. Seaman's

physical examination of Link showed moderate synovitis of multiple finger joints and wrists. Both elbows were unable to extend fully, and fluid was present on her left elbow, and her knees. Id. Dr. Seaman diagnosed JRA with *significantly continued* [emphasis added] disease activity. His treatment plan included the injectable anti-inflammatory medication, Depo-Medrol, which was administered to Link during the office visit. He also initiated treatment with Prednisone, a corticosteroid, and prescribed sulfasalazine, a drug used to slow disease progression in patients with rheumatoid arthritis. (R. at 509).

At Dr. Seaman's direction, x-rays of Link's hands and knees were taken on February 15, 2010. Link's hands showed generalized osteopenia,[5] and "moderate degenerative changes at the MCP[6] joints." In addition, there were "*moderate to severe degenerative changes*" [emphasis added] evident in both of Link's wrists. Overall, the results showed degenerative changes to both hands that were consistent with Link's diagnosis of rheumatoid arthritis. (R. at 496, 499). X-rays of Link's knees revealed less pronounced degenerative changes. (R. at 497-498).

Link had a follow-up visit with Dr. Seaman on May 24, 2010. She reported that the Depo-Medrol injection had helped only temporarily. She complained of significant pain in her right knee, elbow, and hand. Dr. Seaman's physical examination of Link on this occasion showed "mild synovitis throughout the PIPs and MCPs and wrists, right greater than left." His notes further show that Link's inability to fully extend her right elbow was unchanged. Most remarkably, examination of Link's hands revealed the presence of "significant swan neck and boutonniere deformity," an abnormal bending of the finger joints, resulting in a 'claw-like' appearance and impaired functioning of the hand. Dr. Seaman's treatment plan included

---

[5] Osteopenia is a loss of bone mineral density that is less severe than osteoporosis.

[6] Metacarpalphalangeal ("MCP") joints connect the fingers to the palm of the hands.

increasing the dosage of sulfasalazine, and continuing Link on Prednisone. (R. at 507).

Link appeared at Cherry Tree for her routine chronic condition management visits on July 22, 2010, and December 10, 2010. (R. at 593, 599). It was noted on the latter occasion that she had been unable to see her rheumatologist because she had lost her insurance coverage. Link did, however, return to Dr. Seaman on February 15, 2011, following a period of about three months without medication. (R. at 514). A physical examination showed "moderate synovitis of multiple PIPs, MCPs, wrists, [and] ankles…and a small effusion of the right knee." Dr. Seaman noted that Link had not shown much improvement at the current dosage of sulfasalazine, and it was agreed that she would begin taking methotrexate. At Link's next visit, in April 2011, Dr. Seaman noted that the methotrexate was helpful. (R. at 512).

Link was again seen by Dr. Seaman in July 2011, when it was noted that she had moderate synovitis throughout her hands. Her right knee had developed crepitus, a grating sensation under the skin that is indicative of cartilage wear in the joints. Dr. Seaman advised Link to continue taking methotrexate, and also prescribed Enbrel. (R. at 656). On her follow-up visit in September 2011, the doctor noted that Link was tolerating the Enbrel injection well, and her symptoms had improved. (R. at 654). This visit marked the end of the available medical records from Dr. Seaman.

Starting in April 2011, Link sought treatment for low back pain at Baker Chiropractic & Wellness Center ("Baker"). (R. at 637). On the initial visit, she was found to have a limping left gait, and was diagnosed with displacement of the lumbar disc, and lumbar radiculitis. Id. Link later complained of and was treated for neck and shoulder pain. (R. at 638-650). She continued to receive weekly to bi-weekly chiropractic care at Baker through September 8, 2011, the last

7

date for which treatment notes are available in the record.

Link received psychological counseling for depression at Chestnut Ridge Counseling Services ("Chestnut Ridge") beginning in January 2011. (R. at 526-530). At intake, she related to her counselor that she felt depressed and irritable, and wanted "to learn healthy ways to cope with the physical pain related to her arthritis and [resulting] limitations." Id. Notes from subsequent sessions, which continued twice monthly through at least October 2011, reveal that she regularly reported experiencing persistent chronic pain, sleeplessness due to physical pain, frustration with her physical limitations, as well as grief caused by the death of a loved one. (R. at 530-543, 624-634). She was diagnosed with a mood disorder secondary to medical illness with depressed and anxious mood, and major depressive disorder; and was prescribed antidepressant and sleep medication. (R. at 533-534).

### 2. Physical Residual Functional Capacity Assessments

On March 15, 2010, Nelson Guelbenzu, M.D., a non-treating, non-examining consultant, completed a Physical Residual Functional Capacity Assessment ("RFC") in connection with Link's applications for DIB and SSI benefits. (R. at 437-443). Dr. Guelbenzu opined that Link was able to "occasionally" lift or carry twenty pounds, and "frequently" lift ten pounds. He concluded that she could stand, walk, or sit for about six hours in an 8-hour workday. Her ability to push and/or pull was described as limited in both upper and lower extremities. (R. at 438). Dr. Guelbenzu asserted that Link could "occasionally" use ramps and climb stairs, kneel, crouch and crawl; and could "frequently" balance and stoop. Regarding Link's use of her hands and arms, he reported that her fine manipulation, feeling, and ability to reach in all directions was *unlimited*, but her gross manipulation was limited in that she "can perform occasional activities

involving handling with both hands." (R. at 439)(italics added)).

Dr. Guelbenzu conceded that the medical evidence in Link's case established a medically determinable impairment of juvenile rheumatoid arthritis. (R. at 442). In addition, Dr. Guelbenzu notes Dr. Seaman's findings, as set forth *infra* regarding moderate synovitis of multiple sites, lack of full extension of elbows, knees with moderate effusions and an assessment of "JCA with significantly continued inflammatory disease activity." (R. at 442-443). In addition, he finds Link's "symptoms and alleged functional limitations … consistently described throughout her case record," and gives consideration to the opinion of her treating physician that she is disabled. Id. However, Dr. Guelbenzu does not explain his contradictory findings of unlimited fine manipulation in her hands and arms, or her ability to frequently lift, stoop, crawl and kneel, given his assessment of her medical treatment records and his conclusion that a treating source's report that the claimant is limited in lifting, pushing and pulling is "fairly consistent with the other evidence in file." Id.

On July 19, 2011, Dr. Seaman, Link's treating rheumatologist, completed an RFC of Link. Dr. Seaman reported that Link regularly experienced pain and swelling in her hands, wrists, knees, feet, and ankles that could be expected to "frequently"[7] interfere with her attention and concentration during a typical workday. (R. at 544-545). He indicated that Link could sit and stand for "less than" two hours at one time, and would require frequent unscheduled breaks during an 8-hour workday. (R. at 546). Dr. Seaman also found that Link could "rarely"[8] lift and carry up to ten pounds, and never lift heavier weights. She could "rarely" twist, bend, and squat; and "never" climb ladders or stairs. (R. at 547). Link's ability to use her hands, fingers, and

---

[7] "Frequently" is defined as 34% to 66% of an eight-hour working day. (R. at 545).

[8] "Rarely" is defined as 1% to 5% of an eight-hour working day. Id.

arms for grasping, fine manipulation, and reaching was deemed by Dr. Seaman to be limited to 5% of a typical workday. He believed that Link's impairments were likely to produce "good days" and "bad days," and that, on average, she was likely to be absent from work more than four days per month. He further noted that Link was not a malingerer. (R. at 545-547). In sum, Dr. Seaman believed that Link was disabled.

### 3. Mental Health Residual Functional Capacity Assessment

On November 23, 2011, Lenore Borucki, a certified registered nurse practitioner, completed a Mental Health Residual Functional Capacity Assessment of Link. (R. at 631-636). Ms. Borucki, who saw Link for periodic medication visits, was not her treating counselor and did not provide a complete assessment. In particular, she stated that she was unable to assess Link's work performance capabilities, and did not complete the portions of the questionnaire pertaining thereto. Id. To the extent that Ms. Borucki was able to evaluate Link's mental impairment, she indicated that Link's mood was "depressed and worrisome." (R. at 631). She reported that Link exhibited psychological symptoms such as decreased energy, difficulty thinking or concentrating, generalized persistent anxiety, and sleep disturbance. (R. at 632). Ms. Borucki concluded that Link's functional limitations resulting from her mental impairments were mild to moderate. (R. at 634).

### C. Testimony at ALJ Hearing

The hearing before the ALJ took place on December 12, 2011. Link testified that she was thirty-two years old, 5'4" tall, and weighed about 175 pounds. (R. at 37-38). She graduated high school, and received post-secondary training in child care at a technical college. (R. at 40). Link is the mother of two children, aged two-and-a-half and eleven. She stated that she resides

10

with her children, her significant other, and his two teenaged children. (R. at 38). Link further testified that she holds a driver's license, and limits her driving mainly to attend medical appointments. (R. at 39).

Link's most recent employment was at a snack bar on the grounds of a country club, where she was a short-order grill cook and food server. She previously worked as a telemarketer for four years, until approximately January 2008. (R. at 42-44). Prior to this, she worked as a waitress in a restaurant, and was also briefly employed in 2000 as a nanny for an infant. (R. at 45-46). Link has not worked since approximately September 30, 2008, when her seasonal employment at the country club concluded. (R. at 41).

Link was diagnosed with juvenile rheumatoid arthritis in 1989. She attributes her inability to work to JRA and depression, the latter of which she believes is related to her physical condition. Link testified that she has constant pain throughout her body, and that she experiences stiffness every morning in her knees, ankles, elbows, and neck. On a scale of zero to ten, she rated her pain at eight or nine. (R. at 49-50). In addition to her oral testimony, Link displayed to the ALJ the deformities in her hands, and her inability to fully straighten her elbow. (R. at 52).

When questioned about her treatment, Link stated that she takes Enbrel, Fosamax, and methotrexate weekly; as well as prednisone every other day. She stated that the medications make her drowsy, dizzy, and nauseated. She believes that the Enbrel has provided the most relief, but that she might be forced to discontinue it because she is experiencing an adverse skin reaction. (R. at 49-50). Link testified that she regularly visited a chiropractor for treatment of her back pain, and that for the past nine to twelve months she received bi-weekly treatment for

11

her depression at Chestnut Ridge. (R. at 53). In 2009, she underwent jaw surgery to correct problems related to her arthritis. (R. at 54).

Regarding her physical limitations, Link testified that she is unable to walk on uneven surfaces. She stated that she is able to walk for approximately half an hour at the grocery store but must use a shopping cart for support, and can stand for ten to fifteen minutes before her knees begin to stiffen. Link testified that her hands are very stiff; she has difficulty grasping objects with her fingers, and frequently drops things (R. at 56-57). She receives significant help from family members in order to care for her younger child, and also requires assistance with grocery shopping. She stated that when she performs minor household chores like washing dishes or doing laundry, she "usually pay[s] for it the next day." (R. at 59).

Upon examination by her attorney, Link described how her physical limitations affect her mental state. She expressed frustration that she cannot perform simple household tasks like opening a bottle of milk, or reaching into an overhead cupboard. Approximately twice weekly, she is so depressed that she does not leave her bed. (R. at 64). She takes Zoloft for her depression, but does not feel that the medication has been effective. She does, however, find her counseling sessions to be helpful. (R. at 61). Link further testified to experiencing daily headaches that sometimes require sleep to alleviate. (R. at 65).

Following Link's testimony, Larry Bell, a vocational expert, was called to testify. Bell categorized Link's past work as a childcare provider as light and semiskilled; her work as a grill cook as light and semiskilled; and her work as a telemarketer as sedentary and semiskilled. (R. at 68). Asked whether a person of Link's age, education, work experience, and functional capacity would be able to perform any of Link's past work, Bell testified that such work would

not be eliminated. (R. at 69). When additional mental limitations were inserted into the hypothetical, Bell stated that a person subject to such limitations would not be able to perform Link's past work, but would be able to perform light, unskilled jobs such as laundry folder and hand packer that are available in the national and regional economy. (R. at 71). However, when presented with a hypothetical person with functional limitations consistent with Dr. Seaman's assessment of Link, Bell stated that such a person would be unable to work at any level of exertion. (R. at 72).

Based upon this evidence, the ALJ found that although Link is not capable of performing her past relevant work, she has the residual functional capacity to perform a modified range of light, unskilled work that exists in the national economy and, thus, is not disabled as defined under the Act. (R. at 19).

### D. Standard of Review

Presently before the Court are the parties' cross-motions for summary judgment. In reviewing the administrative determination by the Commissioner, the question before the court is whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987). Substantial evidence is defined as less than a preponderance, but more than a mere scintilla. Perales, 402 U.S. at 402. If supported by substantial evidence, the Commissioner's decision must be affirmed. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

A five-step process is used to determine disability eligibility. See 20 C.F.R. §§ 404.1520(a) and 416.920(a).[9] Here, the ALJ determined that Link was not disabled at the fifth step, finding that, considering Link's residual functional capacity,[10] age, education, and past work experience, she could perform a modified range of light work[11] that exists in significant numbers in the regional or national economy. (R. at 24). 42 U.S.C. § 416.960(c). See Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

**E.     Discussion**

To support her position that the ALJ's decision is not supported by substantial evidence, Link appears to argue that it was improper for the ALJ to rest his decision upon the opinion of Dr. Guelbenzu, the state agency consultant, who never examined or treated her, in light of the existence of well-supported contradictory evidence from Dr. Seaman, her treating rheumatologist. The ALJ accorded "great weight" to the RFC prepared by Dr. Guelbenzu, which the ALJ believed "accurately depicted [Link's] functional limitations," despite the fact that Dr. Guelbenzu "did not have an opportunity to examine or treat the claimant." (R. at 22). The ALJ assigned "little weight" to the opinion of Dr. Seaman, believing that the limitations determined by Dr. Seaman were inconsistent with the findings in his treatment notes. Id. In doing so, the ALJ failed to explain the contradictory findings in Dr. Guelbenzu's report and its finding of

---

[9] The five-step sequential evaluation process for disability claims requires the Commissioner to consider whether a claimant: (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his past relevant work, and (5) if not, whether he can perform any other work in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v).

[10] A claimant's "residual functional capacity" is what he can do despite the limitations caused by his impairments. Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001).

[11] "Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

consistent evidence of physical limitations in Link's medical records.

As a preliminary matter, the United States Court of Appeals for the Third Circuit generally looks with disfavor on ALJ decisions that credit the opinions of non-examining medical consultants over those of treating sources. Brownawell v. Commissioner of Social Security, 554 F.3d 352, 357 (3d Cir. 2008). It is well-settled in this jurisdiction that the standard guiding disability determinations calls for the ALJ to give "great weight" to the opinions of treating physicians, particularly "when their opinions reflect expert judgment based on continuing observation over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999). Where there is a difference of opinion between a treating physician and a non-treating, non-examining physician, the ALJ is permitted to decide whom to give greater weight, but "cannot reject evidence for no reason or for the wrong reason." Id. In rejecting the opinion of the treating physician, the ALJ may not rely upon his or her own "speculative inferences from medical reports," and may not substitute his or her own credibility judgment, speculation or lay opinion for that of a treating physician. Smink v. Colvin, 196 Soc.Sec.Rep.Serv 563 (M.D. Pa. Nov. 19, 2013) (citing Plummer, 186 F.3d at 429).

The ALJ believed that Dr. Seaman's assessment of Link's limitations were "out of proportion with the physical examination findings from his treatment notes," and he justified discrediting Dr. Seaman on that basis. (R. at 22). To support his contention that Dr. Seaman was not credible, the ALJ points to a note made by Dr. Seaman on September 22, 2011, indicating that Link was responding well to a new medication, Enbrel, and her symptoms had dramatically improved. From this remark, the ALJ inferred that Link's condition was not

15

disabling. These facts are analogous to Brownawell, wherein the Court rejected the ALJ's conclusion that the claimant, who suffered debilitating migraine headaches, was not disabled because her physician's longitudinal treatment notes stated that she was stable and responding well to medication. Brownawell, 554 F.3d at 356. Citing its opinion in Morales v. Apfel, 225 F.3d 310 (3d Cir. 2000), the Court of Appeals stated that "a doctor's observation that a patient is 'stable and well controlled with medication' during treatment does not [necessarily] support the medical conclusion that [the patient] can return to work." Brownawell, 554 F.3d at 356.

Dr. Seaman treated Link regularly from January 2010 onward, and found ongoing deterioration and significant impairment of Link's ability to use her hands, fingers, and arms. In his RFC prepared in July 2011, he assessed her residual functional capacity with respect to any use of her hands at a mere five percent of a typical working day. (R. at 547). Although Dr. Seaman did later indicate that Link's symptoms were improving with Enbrel treatment, it was improperly speculative for the ALJ to infer from this that Link's condition was so greatly improved that a finding of statutory disability could not be reached. Furthermore, as the Court noted in Brownawell, there is an important distinction to be made between a doctor's notes describing a claimant's condition at the time of an examination, and that doctor's ultimate opinion on the claimant's ability to work. Brownawell, 554 F.3d at 356. Link's success with Enbrel was notable from a treatment perspective, and therefore recorded by Dr. Seaman. However, these notes are not meant to reflect Dr. Seaman's assessment of Link's ability to function in a work environment, and the United States Court of Appeals for the Third Circuit has consistently frowned upon attempts to interpret progress notes in that way. Id. (citing Morales, 225 F3d at 319).

16

The ALJ further contends that Dr. Seaman's opinion is unpersuasive because he prepared his RFC stating that the Link was disabled two months *before* the examination during which her positive results with Enbrel were recorded. The ALJ ignores the uncontradicted evidence of Link's ongoing treatment of her juvenile rheumatoid arthritis by her rheumatologist. Immediately prior to his completion of the RFC, Dr. Season examined Link on February 15, 2011 and on April 12, 2011. (R. at 652-653). The RFC was prepared on July 19, 2011. Dr. Seaman's notes show that Link agreed to try treatment with Enbrel on July 28, 2011. (R. at 656). He noted her progress on September 22, 2011. (R. at 654). Where a concern is raised regarding the viability or clarity of an earlier opinion of disability after the commencement of new treatment, it is incumbent upon the ALJ to seek additional medical evidence. Ferguson v. Schweiker, 765 F.2d 31, 36 (3d Cir. 1985).

The ALJ may properly reject "a treating physician's opinion outright only on the basis of contradictory medical evidence." Plummer, 186 F.3d at 429. In rejecting the treating physician's opinion, the ALJ must present specific contradictory evidence. Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001). Here, the ALJ rejected the opinion of Link's treating physician in favor of that of Dr. Guelbenzu, who the ALJ considered to be accurate and reliable. However, at the time the ALJ rendered his opinion in January 2012, Dr. Guelbenzu's assessment was nearly two years out of date, and failed to explain the many inconsistencies in his report. In preparing the RFC in March 2010, Dr. Guelbenzu, who did not examine Link, consulted the medical records that were available to him, and, it may be presumed, arrived at his conclusions based upon his analysis of those records. While those records did not reflect the later progression of Link's disease as documented by Dr. Seaman and Link's primary care physicians

17

at Cherry Tree, Dr. Guelbenzu found that Link's symptoms were "consistently described" throughout her case record, and found her follow-up care "appropriate." Dr. Guelbenzu further opined that the treating source's conclusion that Link is limited in lifting, pushing and pulling was "consistent with the other evidence in file." (R. at 443). The ALJ's rejection of the evaluation of Link's treating rheumatologist, based upon reliance on Dr. Guelbenzu's report, is without justification.

Further, on similar facts, other courts have been disinclined to uphold the denial of benefits when the ALJ relied upon an outdated report of a non-treating physician, and there was evidence on the record that the claimant's condition deteriorated after the report was prepared. See Griffies v. Astrue, 855 F.Supp.2d 257 (D. Del. 2012) (recognizing that non-treating sources should be 'evaluated to the degree to which these opinions consider all of the pertinent evidence in [the] claim.'); Foley v. Barnhart, 432 F.Supp.2d 465 (M.D. Pa. 2005). In assigning "great weight" to Dr. Guelbenzu's opinion, the ALJ failed to take into consideration the degenerative nature of Link's JRA. Dr. Guelbenzu's assessment is not legitimate contradictory evidence as much as it is stale, incomplete evidence, and it cannot support a rejection of a treating physician's contrary opinion.

For the foregoing reasons, the ALJ's denial of Link's applications for DIB and SSI benefits is not supported by substantial evidence, and it cannot be affirmed. The only remaining issue is whether an immediate award of benefit is justified, or whether the proper remedy is a remand for further consideration of Link's applications.[12] A judicially-ordered award of benefits

---

[12] With regard to Link's mental residual functional capacity, substantial evidence exists to support the ALJ's conclusion that Link's mental impairments, taken singly or cumulatively, do not rise to the level contemplated by the Act. As further analysis of this issue would not alter the decision reached in herein, no additional discussion is needed.

18

is appropriate only where "the evidentiary record has been fully developed," and where "the evidence as a whole clearly points in favor of a finding that the claimant is statutorily disabled." Ambrosini v. Astrue, 727 F.Supp.2d. 414, 432 (W.D.Pa. 2010). That standard has not been satisfied in this case.

Although the report of the non-examining physician does not support the rejection of Dr. Seaman's assessment, the ALJ was not bound by that assessment. Brown v. Astrue, 649 F.3d 193, 196, n. 2 (3d Cir, 2011). Given the ALJ's skepticism of the limitations assessed by Dr. Seaman, and his characterization of them as inconsistent with the physical examination findings from the doctor's treatment notes, the ALJ would have been justified in requesting that Link undergo a consultative physical examination by a board certified rheumatolgist. Stephens v. Heckler, 766 F.2d 284, 289 (7th Cir. 1985) (recognizing that while a "treating physician may too quickly find disability," a consultative examiner "may bring both impartiality and expertise" to the adjudicatory process). For this reason, the proper remedy is a remand for further proceedings, rather than an immediate award of benefits.

### F. Conclusion

Summary judgment is appropriate when there are no disputed material issues of fact, and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; Edelman v. Commissioner of Social Sec., 83 F.3d 68, 70 (3d Cir. 1996). In the instant case, material factual issues are in dispute, and the ALJ's decision is not supported by substantial evidence. For this reason, it is recommended that the Commissioner's Motion for Summary Judgment be denied, and that the Plaintiff's Motion for Summary Judgment be denied to the extent that it requests an award of benefits, but granted to the extent that the Commissioner's administrative decision shall

be vacated. Accordingly, it is recommended that the Commissioner's decision be vacated, and that the matter be remanded to the ALJ for further consideration of the medical evidence.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n. 7 (3d Cir. 2011). Any party opposing objections may file their response to the objections within fourteen (14) days thereafter in accordance with Local Civil Rule 72.D.2.

    Respectfully submitted,

    /s/ Maureen P. Kelly
    MAUREEN P. KELLY
    UNITED STATES MAGISTRATE JUDGE

Dated: July 3, 2014

cc: All counsel of record via CM-ECF